### WILLSON v. FAXON, WILLIAMS & FAXON.

(Supreme Court, Appellate Division, Fourth Department. May 4, 1910.)

1. DRUGGISTS (§ 10*)—DRUGS DANGEROUS TO HEALTH—EVIDENCE.
   Evidence, in an action against a druggist for a sale of noxious drugs, *held* to show that a' preparation containing calomel, taken according to directions on the label, would not be injurious to human health.
   [Ed. Note.—For other cases, see Druggists, Dec. Dig. § 10.*]

2. DRUGGISTS (§ 8*)—DRUGS DANGEROUS TO HEALTH.
   A preparation is not "deleterious" to human health, in the ordinary acceptation of that term, simply because one person in a multitude of those using it happens to meet with ill effects.
   [Ed. Note.—For other cases, see Druggists, Dec. Dig. § 8.*]

3. DRUGGISTS (§ 9*)—CARE REQUIRED.
   Public Health Law (Laws 1900, c. 667) § 197, subd. 2, provides that every proprietor of·a drug store shall be held responsible for the quality and strength of all drugs or medicines sold by him except those sold in original packages of the manufacturer and those articles or preparations known as patent or proprietary medicines. *Held*, that where a druggist had for a long time purchased a proprietary preparation, which was not imminently dangerous, from a long-established manufacturing company with excellent reputation, he could place reliance upon the capability and standing of the company, and was not required to exercise extraordinary care or the highest efficiency; but the test of reasonable care usually applied in actions of negligence would apply in measuring his legal responsibility to a buyer injured by the use of such preparation.
   [Ed. Note.—For other cases, see Druggists, Dec. Dig. § 9.*]

Appeal from Trial Term, Erie County.

Action by Fannie E. Willson against Faxon, Williams & Faxon. From a judgment for plaintiff and orders denying a new trial, defendants appeal. Reversed, and new trial granted.

See, also, 122 N. Y. Supp. 783; 63 Misc. Rep. 561, 117 N. Y. Supp. 361.

Argued before McLENNAN, P.· J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

Carlton E. Ladd, for appellants.
Charles Newton, for respondent.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

SPRING, J. The action was submitted to the jury as one of negligence, and with the assent of the attorneys for the plaintiff, and must be so treated upon this appeal.

The defendant is a domestic corporation with retail stores in the city of Buffalo, and deals extensively in drugs, patent and proprietary medicines.

On a Saturday in January, 1905, the plaintiff and her husband were in one of these stores, and their attention was attracted by packages of tablets, and, after some conversation with the clerk in charge, the husband purchased a package for 25 cents. The package was labeled as follows:

"Price 25 cents. Kascara Kathartics cure constipation. Faxon, Williams and Faxon, Mfg. Druggists, Buffalo, N. Y."

On the reverse side:

"Directions. Kascara Kathartics can be taken at any time. As a laxative eat one tablet. For constipation, a tablet at bed time, and one before breakfast will prove satisfactory. In obstinate cases continue this treatment until cured. Children, one quarter to one-half tablet, according to age."

On one side of the box:

"Stimulate the liver. Invigorate the bowels."

On the reverse side:

"Purely vegetable. Pleasantly effective."

The plaintiff and her husband each took one of the tablets, and after arriving at her home in Brockport, N. Y., the plaintiff partook of a cathartic, as she was a sufferer from chronic constipation. On Friday evening of the following week she started for New York and swallowed another tablet and three others at intervals of 12 hours. She was afflicted on Saturday and Sunday with swollen face and gums, an excessive discharge of saliva, ulcers on the cheek, and other ills, which continued for a long time, and from the effects of which she claimed she had not recovered at the time of the trial in May, 1909.

The evidence warranted the finding of the jury that the salivation and other injuries resulted from taking the tablets purchased of the defendant.

The plaintiff and her husband testified that at the time they purchased the box of tablets the clerk who made the sale informed them that the preparation was the same as cascara segrada, only in tablet form. It was hardly possible for any one in defendant's employ to remember the sale, so that the evidence of the plaintiff and her husband as to that transaction was not directly contradicted. The plaintiff had long been taking cascara segrada for constipation. This preparation is a syrup cathartic made from the bark of a tree. Each tablet of the Kascara Kathartics contains one-fifth of a grain of calomel combined with senna and podophyllin, which are laxative vegetable extracts, intended as a cathartic to expel the calomel from the system, although that ingredient is a laxative or cathartic. The tablets were not, therefore, "purely vegetable," as represented on the labels, yet far the greater part of the preparation was a vegetable composition.

The court, in charging the jury, made this statement:

"There is not anything in this case which made it illegal for these de-- fendants to sell this box without stating what its contents are, what the contents of the tablets are, and it is not the gist of this action that these things are sold as cascara when they are not cascara, nor is it the gist of this action that these things contain calomel when there is nothing in the representation made at the time of the sale to indicate that calomel was contained therein. The gist of this action is negligence on the part of the defendant in selling as a harmless remedy something which was detrimental to human health."

He then left to the jury the two propositions for them to pass upon: First, whether the article was dangerous to human health when taken according to the directions contained on the label. Second, was the defendant negligent in selling the tablets? I think the evidence contained in the record fails to establish either of these propositions.

First. The public health law (chapter 661, Laws 1893, amended by chapter 667, Laws 1900; chapter 45, § 236, Consol. Laws) contains an enumeration of the poisons which it is unlawful to sell at retail without affixing to the package "a label containing the name of the article and the word 'Poison' distinctly shown." Calomel is not included in the elaborate lists in these schedules. Again, the prohibition, in any event, does not extend to "the manufacture and sale of proprietary medicines." Laws 1900, c. 667, § 199; Laws 1901, c. 648; Consol. Laws, c. 45, § 237.

Calomel is not a poison within the prohibited class, and its use is not per se dangerous to human health. The evidence shows that it is frequently used, and that the quantity which the plaintiff took, according to her testimony, would not be expected to be followed by any serious results.

Dr. Anderson, a witness on behalf of the plaintiff, and who attended her first after she had taken the tablets, testified that in administering calomel he gave "one-tenth of a grain every hour until I have given a grain," and he further testified:

"I remember that Mrs. Willson (the plaintiff) said that she had been taking these tablets every day for quite a while. I think it was a matter of weeks, perhaps months. I would call half a grain of calomel at night and a half grain at morning for two or three days a moderate dose."

It seems that the plaintiff had been accustomed to take calomel for constipation.

Dr. Hazen, her family physician in Brockport, testified that he gave her at one time 7½ grains of calomel without causing salivation. He also testified:

"If this tablet contains sufficient other cathartic ingredients—that is, podo-- phyllin and senna—to act freely, it would in all probability carry off calomel. I never heard of any case where the taking of one-fifth grain of calomel, except Mrs. Willson, produced salivation. I don't know that I ever heard of such a case in the books."

Dr. O'Gorman, a physician testifying for plaintiff, said that one-tenth of a grain of calomel every half hour until a grain was taken was safe practice.

Dr. Clinton, on behalf of the defendant, testified:

"Senna is a vegetable drug used for cathartic purposes. Podophyllin is a resin and is also generally used for cathartic purposes. In my practice I have often prescribed calomel. In my judgment the ordinary dose for a person, such as Mrs. Willson, as I examined and found her to be, would be one to five grains for cathartic purposes and half a grain or a grain for laxative purposes. Calomel is sometimes given in small doses repeated at short intervals, and sometimes in large doses for a single taking. * * * I cannot recollect ever having heard of a person being salivated by the taking with or without a cathartic of any amount of calomel less than one grain. That is less than one grain over a period of 48 hours. It has never happened in my practice."

All the physicians agree that the salivation and other results following the taking of the small number of tablets as testified by plaintiff was unusual and not to be anticipated. Either the plaintiff was at the time peculiarly susceptible to calomel, or else she must have taken a far greater quantity than she stated.

The calomel was a cathartic, and its laxative properties were reinforced by the other two purgative ingredients composing the preparation, and, if taken as directed on the label, the person would not retain in the system sufficient of the mercury to produce any injurious results. A preparation is not "deleterious" to human health, in the ordinary acceptation of that term, simply because one person in a multitude of those using it happens to meet with ill effects from taking it.

Second. The proof utterly failed to establish the negligence of the defendant.

The public health law (Laws 1900, c. 667, § 197, subd. 2) in force at the time the tablets were sold provides as follows:

"Every proprietor of a wholesale or retail drug store, pharmacy, or other place where drugs, medicines or chemicals are sold, shall be held responsible for the quality and strength of all drugs, chemicals or medicines sold or dispensed by him except those sold in original packages of the manufacturer, and those articles or preparations known as patent or proprietary medicines."

Upon the trial of the action these facts were stipulated:

"Kascara Kathartics is a patent or proprietary medicine manufactured by Billings, Clapp & Co., wholesale druggists of Boston, Mass. Billings, Clapp & Co. are well-known and reputable manufacturers of high-grade patent and proprietary medicines. Kascara Kathartics were sold by salesmen and by letter to the trade either in bulk or with a label of Billings, Clapp & Co. attached, or in boxes with a special label of the customer attached. The boxes are usually 10 and 25 cents size retail. The quantities of Kascara Kathartics put upon the market are about 500 to 1,000 pounds a year, and they have been upon the market for about 10 years. Labels on the boxes are printed in various ways as designated by the customer with his name thereon, and, in the absence of any directions by the customer, Billings, Clapp & Co. put on their own labels, which are printed at the factory and the goods are packed there."

Also that Billings, Clapp & Co. had been selling this preparation for 10 years and had 200 or 300 different customers "all through the eastern and northern parts of the United States"; that this manufacturing firm had been in the business since 1857, and with the reputation "of being first-class manufacturing pharmacists."

The evidence showed that the defendant had been selling these tablets since March, 1903, and had disposed of about 900 boxes during that time, and without complaint from any one. They were all sold

in the original packages as put up and labeled by the manufacturers. They were not analyzed by the defendant, and it appeared without dispute that proprietary medicines are not analyzed by the retail druggists.

The defendant was not required to exercise extraordinary care or the highest efficiency. It purchased of a long-established manufacturing company of excellent reputation, and was justified in placing reliance upon the capability and standing of this company. The test of reasonable care usually applied in actions of negligence (Carlson v. Phœnix Bridge Co., 132 N. Y. 273, 30 N. E. 750; Paul v. Con. Fireworks Co., etc., 133 App. Div. 310, 117 N. Y. Supp. 698) is pertinent in measuring the legal responsibility of the defendant.

The cases cited by the respondent's counsel are not applicable. In Thomas v. Winchester, 6 N. Y. 397, 57 Am. Dec. 455, a leading case, the action was negligence. The defendant, a compounder of drugs and medicinal preparations, sold a package labeled as extract of dandelion, which was in fact extract of belladonna, a deadly poison, and it was finally administered to the plaintiff by her physician in the belief that it was extract of dandelion. The court, in commenting upon the effect of this poison, used this language:

"The death or great bodily harm of some person was the natural and almost inevitable consequence of the sale of belladonna by means of the false label."

The article sold as medicine was "imminently dangerous" to human life, and the defendant was held liable.

In Kuelling v. Lean Mfg. Co., 183 N. Y. 78, 75 N. E. 1098, 2 L. R. A. (N. S.) 303, 111 Am. St. Rep. 691, the action as construed by the Court of Appeals was not in negligence, "but is controlled by considerations resting upon the law applicable to willful and fraudulent deceit and concealment," and an entirely different rule of liability governs.

In Torgeson v. Schultz, 192 N. Y. 156, 84 N. E. 956, 18 L. R. A. (N. S.) 726, 127 Am. St. Rep. 894, the plaintiff lost an eye by the explosion of a siphon bottle of aerated water sold to the plaintiff's employer by the defendant. The evidence was that the defendant knew that bottles so filled were liable to explode, and for that reason the court held that the question of the defendant's liability was for the jury.

The defendant in this case did not know that the tablets it sold to the plaintiff's husband were dangerous, and in that fact is the controlling distinction. O'Neill v. James, 138 Mich. 567, 101 N. W. 828, 68 L. R. A. 342, 110 Am. St. Rep. 321. It believed a person could safely take them without any deleterious results, and the belief was well founded on a long experience in selling them. They were not imminently dangerous, and the rule in the cases cited ought not to control in this case. Bruckle v. Milhau's Son, 116 App. Div. 832, 102 N. Y. Supp. 395; Loop v. Litchfield, 42 N. Y. 351, 1 Am. Rep. 513.

A new trial should be had.

Judgment and order reversed, and a new trial granted, with costs to appellant to abide event. All concur.