JOHN JOSEPH CLEARY, an Infant, by MARY ELLEN CLEARY, Guardian ad Litem, and EDWARD S. CLEARY, Plaintiffs, *v.* JOHN M. MARIS COMPANY, Defendant.

Supreme Court, Trial Term, Kings County, March 4, 1940.

*Wait, Wilson & Newton* [*Howard G. Wilson* of counsel], for the plaintiffs.

*Clarence E. Mellen,* for the defendant.

STEINBRINK, J. The infant plaintiff, now about four years of age, through his guardian *ad litem*, sues for personal injuries and the father asks damages for loss of services and expenses caused by the alleged poisoning of the infant through the ingestion of lead during the very early part of his life and immediately following his birth, which occurred on June 6, 1936, in a hospital in New Jersey. The child was breast-fed and on or about June 16, 1936, when the mother with her infant returned home, finding that her breasts were sore, she sent her husband to purchase a pair of metallic nipple shields. These were manufactured for the defendant by the Consolidated Fruit Jar Company and marketed in unsealed cardboard boxes with a circular which referred to the history of the development of these metallic shields, going back to a paper by Dr. Wansbrough, the inventor, and published in the *Lancet* as early as 1842. An extract from that paper was embodied in this circular and also directions. The first paragraph of these directions reads as follows:

" For the prevention and cure of sore nipples these shields should be applied as soon after delivery as possible, and in using them the only attention required is to wipe the nipple previously to nursing and apply the shield again immediately afterwards. *They are in no way likely to be injurious to the infant.*"

These nipple shields, the mother testified, were worn by her in keeping with the directions and in or about the month of January, 1937, the infant showed signs of illness.

These shields are of pure metallic lead, shaped somewhat like a small sombrero hat with the base slightly larger than a silver dollar. It is claimed that these shields were steadily worn, excepting during the fifteen minutes feeding of the infant, prior to which the mother says that with a pledget of absorbent cotton she wiped the breast at which the infant was to feed with a boric acid solution.

Toward the end of January of 1937 the infant became violently ill and was removed to a hospital where, after tests and treatment, his condition was diagnosed as one of lead poisoning.

It is the plaintiff's claim that the infant ingested the lead from the mother's breasts in spite of the cleansing process and that the lead thus ingested was deposited in the fissures of the mother's sore breasts, and that the steady nursing of the infant over the period of six months or more caused this infant's illness, so the plaintiff asserts that these nipple shields are not only inherently dangerous but that they were marketed without proper warning or instructions. Since these appliances were manufactured for and marketed by the defendant, it would be liable as would the manufacturer. (*Willson* v. *Faxon, Williams & Faxon*, 208 N. Y. 108; *Squire* v. *F. W. Woolworth Co.*, 263 id. 532.)

No one will gainsay the claim that if a product is inherently dangerous or is known to contain hidden danger, that a relative duty rests on the manufacturer or the one marketing such products as his own to give fair warning or instructions to the using public. From the evidence in this case it appears that many thousands of these appliances have been sold and used both in England and in the United States for a period of more than ninety years. In all of that period, only once, so far as the evidence discloses, did any member of the medical profession question their safety or efficiency for the use for which they were intended. That occasion was in the course of a paper published in the Journal of the American Medical Association, May 15, 1926, page 1514, and the first of the two cases there referred to must be conceded to be of no value since the cited history of the case indicates that " The first mother was negligent in washing her nipples." The second case referred to is one based, of course, on hearsay, there being no direct evidence

before this court with reference to its authenticity. In the opening sentence of this medical article the authors say: " Lead poisoning in nursing infants is extremely rare. * * * One cannot be certain that the nursing infants may not also have sucked lead from the skin or hair of the mothers, or carried it to their mouths on their hands."

Further, they observe that " we have not found the use of lead nipple shields by nursing mothers previously demonstrated as a source of lead poisoning in infancy."

Other medical authorities referred to in this article call attention to cases of lead poisoning due to the use of nursing bottles that had lead incorporated into the glass; of nursing bottle stoppers, both of metallic lead and of lead-containing rubber and from lead frames in which nursing bottles were held; of lead powders used by mothers as cosmetics, and inhalation of lead dust, lead paint from a doll and clothing material impregnated with lead. These are given as sources of lead poisoning in infants of nursing age.

Say the authors, " Personal communication with obstetricians in New York testifies that the lead nipple shield is a commonly employed therapeutic measure in both dispensary and private practice. The duration of the use of the shields is usually less than one month, and a careful washing of the nipples previous to each nursing is advised. Under such conditions there has been apparently no intoxication in the nurselings."

And so we have a situation of this manufacturer and marketer supplying vast quantities of these shields with no knowledge that they were in any sense dangerous.

It is a matter of common knowledge that many persons are allergic to conditions which do not affect the normal individual. Cases so holding are legion with reference to wearing apparel, cathartics, face powders and sedatives. In this State it has been held that " A preparation is not deleterious to human health in the ordinary acceptation of that term simply because one person in a multitude of those using it happens to meet with ill effects from taking it." (*Willson* v. *Faxon, Williams & Faxon*, 138 App. Div. 359, 364.) How from the evidence before this court can it be determined whether or not this infant was the subject of a peculiar hyper-sensitivity to the almost insignificant lead deposits (if there were any) upon the mother's breasts? It is the plaintiff upon whom rests the burden of proving this case by a fair preponderance of the evidence. Prior to the time that this infant became ill there was no way of determining whether the infant would, by some idiosyncratic reaction, respond to the infinitesimal quantities of lead which it is claimed were ingested with each feeding and extending over this six or seven months' period.

What was the duty which this defendant owed to the public and to these plaintiffs, keeping in mind at the same time the obligations which rest on the plaintiffs, for they must show, *first*, that the injury resulted from lead ingested by the infant, even though the mother followed the directions accompanying these shields; *second*, that these shields were inherently dangerous and poisonous; and *third*, that the defendant was negligent in putting upon the market such dangerous and poisonous appliances. Judge LEHMAN (now Chief Judge), in *Karr* v. *Inecto, Inc.* (247 N. Y. 360, 364), discussed the principle here involved, when he said:

" Possibly some individuals may possess a peculiar immunity against the effects of a particular chemical poison or irritant; possibly other individuals possess a peculiar susceptibility. We know only that even if the dye used may possibly be a competent producing cause of a morbid condition such as developed in plaintiff's finger, it does not always produce such a result, otherwise the customer would not have escaped injury. All else rests purely on conjecture.

" Doubtless there are cases where a condition is so closely linked to an antecedent occurrence that the inference that the condition was the result of the occurrence may logically be drawn, even though there is otherwise no evidence as to whether the occurrence might be a competent producing cause of the condition. That is, of course, true wherever other possible causes are excluded."

Nor is this court certain that other possible conditions have been excluded. The mother's testimony of her strict adherence to instructions is received with great caution, for it undoubtedly is tainted not only by her interest in the infant but in defense of her own conduct. This infant was kept in a painted crib. Sucking the sides of the crib or rubbing its gums thereon might well again be a competent producing cause of lead ingestion, and in spite of the mother's denial there still remains the probability that the infant was permitted to use these shields, while worn by the mother, as pacifiers are frequently used.

In the *Karr* case (*supra*, p. 365) Judge LEHMAN, in closing his opinion, said: " Then we are asked to go further and find that the dye not only caused the injury but was so inherently dangerous that the defendant was negligent when it put the bottle on the market though dye from exactly the same bottle produced no harmful effect upon the customer."

Many thousands have used Dr. Wansbrough's nipple shields without resultant harm. The general principle of inherently dangerous products was never better stated than in *McPherson* v. *Buick Motor Co.* (217 N. Y. 382, 389). Said Chief Judge CARDOZO in

that case: " There must be *knowledge* of a *danger*, not merely *possible*, but *probable*." (Italics supplied.)

Inherently dangerous things are " things which in their normal operation are implements of destruction."

Lead is a commodity in common use for a great variety of purposes. It is present in varying quantities not only in most chemicals but in many articles of diet. The duty owed by this manufacturer was basically that of reasonable care under the circumstances. May it here be said that this was a danger reasonable to be anticipated? Anticipation in turn results from knowledge possessed or knowledge which a reasonably prudent manufacturer would possess.

The Appellate Division of this department, in *Boyd* v. *American Can Co.* (249 App. Div. 644), said that the manufacturer " may not be charged with negligence where some unusual result occurs that cannot reasonably be foreseen and is not within the compass of reasonable probability. It is not enough that in the intended use injury is possible." (See, also, *Cullem* v. *Renken Dairy Co.*, 247 App. Div. 742, and cases cited; affd., without opinion, 274 N. Y. 526.)

And again, in *Leideker* v. *Sears, Roebuck & Co., Inc.* (249 App. Div. 835; affd., 274 N. Y. 631), where the instrumentality complained of was a chair which had collapsed, the court said that " All that the manufacturer is required to do is to guard against injury that is reasonably probable."

Subjected to the test of these rules, there must be judgment for the defendant dismissing the complaint on the merits.